Almaz TESFAMARIAM, Petitioner,

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS, INSURANCE ADMINISTRATION, Respondent.**

**No. 93–AA–33.**

District of Columbia Court of Appeals.

Argued May 24, 1994.

Decided Aug. 11, 1994.

Jeremy Flachs, Annandale, VA, for petitioner.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Michael A. Conley, Sp. Asst. Corp. Counsel, Washington, DC, were on the brief, for respondent.

Before STEADMAN, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

Petitioner Almaz Tesfamariam seeks review of a decision by the Insurance Administration of the Department of Consumer and Regulatory Affairs denying her compensation from the Uninsured Motorist Fund. We reverse and remand for further proceedings by the agency.

## I.

### FACTS AND PROCEDURAL HISTORY

On January 17, 1988, at approximately 3:00 a.m., Ms. Tesfamariam, a housekeeper at a Holiday Inn, was a passenger in a taxicab[1] which was being operated by her husband, Selemun Woldu. According to Ms. Tesfamariam, Mr. Woldu failed to stop at a flashing red traffic light, and the cab was struck on the passenger side by an oncoming vehicle owned and operated by Kenneth P. Barzey. Ms. Tesfamariam suffered injuries, some of them permanent, to her head, neck, back and knee. Ms. Tesfamariam required prolonged medical treatment and missed almost a year of work. She claimed before the agency that she incurred medical expenses of $14,522.50 and that she lost wages in the amount of $13,950.00.

The taxicab in which Ms. Tesfamariam was riding was registered in Mr. Woldu's name; Ms. Tesfamariam has never had an operator's license and does not drive at all. Mr. Woldu carried no liability insurance. Ms.

---

1. The parties have not specified in their submissions that the vehicle in which Ms. Tesfamariam was riding was a taxi. Correspondence in the record, however, indicates that it was.

Tesfamariam had health insurance through her employer with Kaiser Permanente, a health maintenance organization (HMO), under a plan which entitled her to benefits only if her treatment was provided by Kaiser-affiliated health care providers. Ms. Tesfamariam apparently believed that the plan only covered illness and not accidental injuries, and she was treated by physicians who were not affiliated with Kaiser. As a result, her medical expenses have not been reimbursed by Kaiser.

Following the accident, Ms. Tesfamariam filed suit in the Superior Court against Mr. Barzey. *See* Civil Action No. 88–CA–010188 (Super.Ct.D.C.). Mr. Barzey filed a third party claim against Mr. Woldu, claiming that Mr. Woldu was responsible for the accident. Mr. Woldu defaulted, and Ms. Tesfamariam won a judgment against him in the amount of $128,472.00.[2] Except for a successfully garnished bank account in the amount of $412.62, however, Ms. Tesfamariam was unable to collect the judgment.

Ms. Tesfamariam next filed a claim against the District of Columbia's Uninsured Motorist Fund ("the Fund") pursuant to D.C.Code § 35–2114 (1993). By letter dated March 2, 1992, her application for benefits was denied on the ground that she was insured by Kaiser Permanente at the time of the accident and that her alleged wage loss was not properly documented. The initial denial was not based on any claim that she was an owner of the vehicle.

Ms. Tesfamariam requested an administrative hearing. On May 11, 1992, the presiding Administrative Law Judge (ALJ) convened a hearing, but he aborted it because he became concerned about Ms. Tesfamariam's limited ability to communicate in English. On June 2, 1992, a second hearing was held, and an Ethiopian interpreter was made available to translate the proceedings from and into Ms. Tesfamariam's native Tigrane. After the hearing, the ALJ issued a written decision in which he held that Ms. Tesfamariam was not

entitled to reimbursement from the Fund either for her medical expenses or for her lost wages. The ALJ reasoned that because Ms. Tesfamariam was married to Mr. Woldu and contributed to the expenses of household, and because she would have been entitled to a share of the family's assets, including the vehicle, in the event of a divorce proceeding, she was an "owner" of the motor vehicle and thus ineligible for benefits. The ALJ further concluded that Ms. Tesfamariam was an "insured" within the meaning of the Uninsured Motorist Fund statute. The agency upheld the ALJ's decision, and Ms. Tesfamariam sought judicial review in this court.

## II.

## LEGAL DISCUSSION

### A. The Statute.

The Uninsured Motorist Fund was established in 1986 to provide compensation for victims of automobile accidents in the District of Columbia who "would not otherwise be compensated for [their] loss[es]." D.C.Code § 35–2114(a).[3] The Fund, which is maintained by assessments on all automobile insurers, is a deposit account in the District's treasury. D.C.Code § 35–2114(a).

A victim is ineligible for compensation from the Fund if he or she "is at fault, *is an insured, owns a registered motor vehicle,* or operated a motor vehicle in the accident upon which the claim is based." D.C.Code § 35–2114(c) (emphasis added). The Compulsory/No–Fault Motor Vehicle Insurance Act of 1982, to which the Fund legislation was added in 1986, defines "owner" as a person "having the property or title to a vehicle ... used or operated in the District...." D.C.Code § 35–2102(21). The statute defines "insured" as "a named insured or any other person insured in an insurance policy...." The ALJ held, in effect, that Ms. Tesfamariam was both an "owner" and an "insured."

---

2. The court found that the accident occurred "[a]s a sole result of defendant Woldu's failure to stop at the blinking red light and yield the right of way to oncoming traffic." The case against Mr. Barzey was dismissed with prejudice.

3. Unless otherwise noted, citations to the District of Columbia Code are to the 1993 replacement volume.

### B. Scope of Review.

In *Tenants of 738 Longfellow Street, N.W. v. District of Columbia Rental Hous. Comm'n*, 575 A.2d 1205 (D.C.1990), we explicated the applicable standard of review as follows:

> This court accords great deference to the interpretation by an agency of a statute or regulation which it administers.... We will reject the [agency's] interpretation of its regulations only if it is plainly wrong or incompatible with the statutory purposes. The deference which courts owe to agency interpretations of statutes which they administer is, of course, at its zenith where the administrative construction has been consistent and of long standing, and plummets substantially when these attributes are lacking.

*Id.* 575 A.2d at 1213 (citations omitted).

 Courts defer to an agency's interpretation, in substantial part, because of its presumed expertise in the subject matter with which it administers and with which it is familiar. Accordingly, we give less weight to an agency's construction where the statute which it is construing is one which it does not administer, and as to which it therefore lacks special knowledge and expertise. *District of Columbia Metro. Police Dep't v. Perry*, 638 A.2d 1138, 1144 (D.C.1994).

### C. The Meaning of "Owner."

With these principles in mind, we turn first to the question whether Ms. Tesfamariam was an owner of the taxicab to which her husband held title. As we stated in *James Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43 (D.C.1989)—a decision on which the Insurance Administration relies—

> [t]he primary rule of statutory construction is that the intent of the legislature is to be found in the language which it has used. Moreover, the words of the statute should be construed according to their ordinary sense, and with the meaning commonly attributed to them. The words used, even in their literal sense, are the primary and ordinarily the most reliable source of interpreting the meaning of any writing.

*Id.* 567 A.2d at 46 (citations and internal quotation marks omitted).

 We do not believe that the ALJ could reasonably conclude that Ms. Tesfamariam was the "owner" of her husband's taxi, or that she had "the property or title" to it, in the ordinary everyday sense of these words. The owner of a vehicle is a person who can sell it; obviously, Ms. Tesfamariam could not transfer this vehicle while her husband, as the registered owner, had the right to dispose of it without consulting her. *See* D.C.Code § 30–201 ("[t]he fact that a person is or was married shall not ... impair the right[s] ... of such person, to hold and dispose of ... property of any kind ..."). The owner of a car must ensure, among other things, not only that the vehicle is insured, but also that it is registered, *id.* § 40–102(a), and periodically inspected, *id.* § 40–201, as required by law. If Ms. Tesfamariam was not the vehicle's owner for these purposes— and she surely was not[4]—it is difficult to discern why she should be treated as its owner for purposes of the uninsured motorist statute. *See Edwards v. United States*, 583 A.2d 661, 664 (D.C.1990) (the same words, when used twice in the same or related legislation, are ordinarily presumed to have the same meaning).

The Insurance Administration focuses on the statutory definition of owner as a person who has *"the property or title"* to the vehicle. D.C.Code § 35–2102(21) (emphasis added). It contends that each word in the statute must be given effect, that no word may be treated as superfluous, *see* 2A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 46.06, at 119–20 (5th ed. 1992), that

---

4. Obviously, Ms. Tesfamariam could not be prosecuted for failure to register the automobile, D.C.Code § 40–105 (1990), or for permitting it to be operated without inspection, *id.* § 40–206. Moreover, the vehicle in this case was a taxi, and under the Regulation of Taxicabs Act, D.C.Code §§ 40–1701 *et seq.*, Mr. Woldu was its only "own-er." That statute provides that " '[t]axi or taxicab owner' means any person ... hold[ing] the legal title to a taxicab the registration of which is required in the District of Columbia." *Id.* § 40–1703(14). Accordingly, Mr. Woldu was the person, and indeed the only person, responsible for having the cab insured. *Id.* § 40–1714(a).

"property" therefore means something different from "title," and that the ALJ reasonably concluded that Ms. Tesfamariam had a property interest in the cab other than legal title and was thus one of its owners. The statute does not provide, however, that anyone with a property interest is an owner; rather, it uses the definite article (*the* property or title).[5] It is difficult to discern how Ms. Tesfamariam could be viewed as having *the* property in a taxi which her husband used in his business as a cabdriver, over which he had sole control, to which he had sole title, and which he could sell or transfer without Ms. Tesfamariam's permission. Considering the ordinary meaning of the word "owner," the use of the definite article in the statutory definition (*i.e. the* property), and the other circumstances discussed above, we do not think that Ms. Tesfamariam was an owner of the taxi within the meaning of the statute.

In ruling that the vehicle was marital property, and that Ms. Tesfamariam was therefore an "owner," the ALJ relied chiefly on *Hemily v. Hemily*, 403 A.2d 1139 (D.C.1979). *Hemily* was decided pursuant to D.C.Code § 16–910 (1989), which governs the distribution of property in a decree of divorce. The ALJ found in divorce law a strong presumption that property acquired during the marriage was jointly owned. *See Hemily, supra*, 403 A.2d at 1143 n. 3. Gleaning from the record that Ms. Tesfamariam and her husband were married in June 1986, and that Mr. Woldu had purchased the car shortly before the accident in January 1988, the ALJ inferred that the vehicle had been acquired during the parties' marriage. He also attempted to analogize from other factors enumerated in § 16–910 as relevant to equitable distribution of marital property, and he cited Ms. Tesfamariam's monetary and other contributions to the marriage. Noting Ms. Tesfamariam's testimony that she turned over her earnings to her husband to pay the family bills, the ALJ inferred that she had also helped to pay the expenses for operating the automobile. Finally, the ALJ concluded, on the basis of his examination of divorce law, that the fact that the car was not titled in Ms. Tesfamariam's name was not dispositive of the issue of ownership.

■■■ In our view, the ALJ erred in attempting to draw from the statute governing equitable distribution of property in a divorce proceeding, § 16–910, the meaning of "owner" as used in the Uninsured Motorist Fund statute.[6] "In enacting ... § 16–910(b), the legislature sought to [enhance] the authority of Superior Court judges to reach equitable results in divorce property dispositions without requiring the court to search for strict legal or equitable ownership interests in the non-titled spouse." *Hemily, supra*, 403 A.2d at 1142; *see also Gore v. Gore*, 638 A.2d 672, 674–76 (D.C.1994). To put it in the vernacular, the equitable distribution statute is not primarily concerned with who owned what during the marriage; rather, it addresses who will *get* what after the marriage is over.

If the legislature had intended that the spouse of the owner of the vehicle, or a member of the owner's household, should be precluded from recovery against the Fund, it could easily have said so. The Insurance Administration is thus asking us to read into the statute a provision which the Council did not enact. As Justice Brandeis wrote in *Iselin v. United States*, 270 U.S. 245, 46 S.Ct. 248, 70 L.Ed. 566 (1926),

> [w]hat the government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function.

*Id.* 270 U.S. at 251, 46 S.Ct. at 218, *see also West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991); *Byrd v. United States*, 598 A.2d 386, 393 (D.C.1991) (en banc).

5. Given the entire context, it may well be that, in this instance, the legislature used "the property" and "title" as synonyms. *Cf. Carter v. United States*, 643 A.2d 348, 358 n. 16 (D.C.1994); *American Radio Relay League, Inc. v. F.C.C.*, 199 U.S.App.D.C. 293, 297, 617 F.2d 875, 879 (1980).

6. We note that the Insurance Administration and its ALJ do not ordinarily administer the divorce laws. To the extent that the ALJ's decision rests on his interpretation of the divorce laws, it is not entitled to deference on the basis of specialized expertise. *Perry, supra*, 638 A.2d at 1144.

### D. The Meaning of "Insured."

Although the ALJ denied relief to Ms. Tesfamariam, in part, because he found her to be an "owner" of the vehicle, the principal focus of inquiry at the administrative hearing was whether she was an "insured" within the meaning of § 35–2114(c). Ms. Tesfamariam, as we have seen, had health insurance with Kaiser Permanente through her employer, but she did not seek treatment from Kaiser-affiliated physicians, apparently as a result of her misapprehension as to the coverage provided by the policy. The ALJ ruled that because Ms. Tesfamariam was covered by health insurance, she was an "insured," and that she was therefore ineligible for compensation, either for her medical expenses or for her lost wages. The Insurance Administration concedes in this court that the ALJ's interpretation of the statute in this regard was incorrect, and we agree.

The Compulsory/No Fault Motor Vehicle Insurance Act defines an "insured" as "a named insured or any other person insured in an insurance policy ..." D.C.Code § 35–2102(10). "An insurance policy" is not further defined, but language elsewhere in the statute, as well as the Act's legislative history, support the conclusion that "an insurance policy" means "a motor vehicle insurance policy." An "insurer" is defined as "any person, company, or professional association licensed in the District of Columbia that provides *motor vehicle* liability protection...." *Id.* § 35–2102(11) (emphasis added). The legislative history tracking the language of § 35–2114(c) is to the same effect: "Persons excluded from compensation are ... (2) a victim who is an insured under an *automobile* insurance policy...." Councilman John Ray, Committee on Consumer & Regulatory Affairs, *Report on Bill 6–249, The "Compulsory/No–Fault Motor Vehicle Insurance Act of 1982 Amendments Act of 1985,"* Oct. 8, 1985, at 16 (emphasis added) [hereinafter Ray Report].

 Ms. Tesfamariam was not covered by an automobile insurance policy. Accordingly, she was not an "insured" within the meaning of the statute. Her health insurance did not disqualify her from receiving compensation. That insurance is relevant, however, because it constitutes a potential collateral source for her medical expenses (although presumably not for her lost wages) and might require a reduction in her ultimate recovery.

"The amounts of compensation awarded shall be equal to the amount of the victim's loss, decreased by all amounts received by or available to the victim from collateral sources." D.C.Code § 35–2114(e). As illuminated by the legislative history, "collateral sources" include any "applicable insurance coverage [or] any other means available to compensate the victim for his or her loss." Ray Report, at 15. Having denied Ms. Tesfamariam's claim in its entirety, the agency has not addressed the issue of collateral source. We leave it to the agency to determine, in the first instance, the effect of Ms. Tesfamariam's health insurance coverage on the proper amount of her award.

### III.

### CONCLUSION

For the foregoing reasons, the decision of the Insurance Administration is reversed, and the case is remanded to the Insurance Administration for further proceedings consistent with this opinion.

*So ordered.*